IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CATHALENE S. GATTO,

     Plaintiff,

       v.

VERIZON PENNSYLVANIA, INC.,

     Defendant.

CIVIL ACTION NO.  08-858

MEMORANDUM OPINION

CONTI, District Judge

      Pending before the court is a motion to enforce settlement agreement filed by defendant Verizon Pennsylvania, Inc. ("Verizon") (Doc. No. 14) and a motion to deny enforcement of settlement agreement filed by plaintiff Cathalene S. Gatto ("Gatto" or "plaintiff") (Doc. No. 20). After considering the evidence presented and the arguments of the parties, Verizon's motion will be denied and Gatto's motion will be granted for the reasons set forth below.

**FINDINGS OF FACT**

      On June 26, 2007, plaintiff a former Verizon employee, filed a lawsuit against Verizon in the United States District Court for the Western District of Pennsylvania, claiming discrimination and violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq.  ("ADA") and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951 et seq. ("PHRA"). On June 23, 2008, Gatto filed a second lawsuit against Verizon in the United States District Court for the Western District of Pennsylvania, claiming retaliation in violation of the ADA and PHRA. This

court granted a joint motion to consolidate the two lawsuits on August 27, 2008. After a case management conference held on September 15, 2008, the parties entered into mediation.

The mediation took place on October 8, 2008, in the office of the mediator (the "Mediator").  (Transcript of Motion to Enforce Settlement Hearing, Day One, February 6, 2009 ("Tr. I") at 14.)  Also present at the mediation were Gatto, Keenan Holmes, counsel for Gatto ("Holmes"), Verizon representative Christine Zorn-Pregel ("Zorn-Pregel"), and Catherine S. Ryan ("Ryan"), counsel for Verizon. (Id.)  During mediation, Verizon made it clear that a settlement could only be reached if Gatto released Verizon from all claims, including grievances and reinstatement.  (Id. at 14-15.)  All parties present at the mediation understood that a global settlement, including all Gatto's claims against Verizon, was requisite to the formation of an agreement. (Id. at 45, 54-55; Transcript of Motion to Enforce Settlement Hearing, Day Two, February 11, 2009 ("Tr. II") at 34-35.)

The October 8, 2008 mediation ended with a proposed $25,000 settlement offer ("the mediation offer") from Verizon that included a full and complete release of all claims Gatto had against Verizon, an agreement not to reapply with Verizon, nondisparagement, and confidentiality. (Tr. I at 15-16.)  Uncomfortable with the terms, Gatto asked Verizon for additional time to consider the offer, and was granted until October 13, 2008. (Tr. I at 16.)  On October 13, 2008, Gatto rejected the $25,000 settlement offer and asked Holmes to move forward with her case. (Tr. II at 44.)  Gatto did not tell Holmes to cease negotiations with Verizon.  (Id. at 44-48.)

In the conversation on October 13, 2008, following the rejection of the mediation offer, Holmes mentioned to Ryan that Gatto was seeking $70,000 to $75,000. (Tr. I at 17, 32.) According to Ryan, during the same conversation, Holmes told her that he was authorized to

make a settlement demand as low as $50,000. (Id. at 18.)  Ryan replied to Holmes that $70,000 was too high and that she would inform Verizon about the $50,000 amount.  (Id. at 17-18.)  The next day, October 14, 2008, Ryan called Holmes and proposed an offer of $30,000, subject to the same terms and conditions as the mediation offer. ( Id. at 18.)

During the following week Holmes attempted to contact Gatto, but was only able to leave a message indicating that Verizon had increased its offer. (Tr. II at 44.)  Gatto returned Holmes' phone call on October 20, 2008. (Id. at 45.)  During this conversation Holmes revealed to Gatto that Verizon had increased its offer to $30,000 and that he believed it was a fair offer. (Id. at 42.) Gatto decided that she would not accept the $30,000 offer because she did not want to settle her pending arbitration case against Verizon. (Id. at 45.)

Holmes testified that Gatto gave him authority to settle for $50,000 sometime after October 17, 2008, but before October 20, 2008.  (Tr. I at 57-58.)  Holmes testified that Gatto told him that she did not think Verizon would accept $50,000, so she was willing to counteroffer with that amount. (Tr. II at 35.)  Later in his testimony, Holmes remembered Gatto's comments slightly differently: Holmes recalled Gatto saying, "Well I don't think they will come up much higher.  Lets [sic] do 50."  (Id. at 42.)

After speaking with Gatto, Holmes sent an email to Ryan noting that Gatto rejected the $30,000 settlement offer.  (Tr. I at 18-19.)  In a phone conversation later that day, Holmes reiterated Gatto's rejection to Ryan, but indicated that Gatto would be willing to settle for $50,000. (Id. at 56-57.)

Ryan contacted Verizon regarding the rejection of the $30,000 offer and the availability of the $50,000 offer from Gatto. (Id. at 19.) Verizon directed Ryan to accept the $50,000 offer. (Id.) That afternoon, on October 20, 2008, Ryan called Holmes and accepted the $50,000 offer on

behalf of Verizon. (Id. at 19-20.)  In addition, Ryan confirmed that the settlement included all previous terms and conditions, including: a release of all claims by Gatto against Verizon, no admission of liability by Verizon, an agreement that Gatto would never reapply for employment with Verizon, and nondisparagement and confidentiality agreements. (Id. at 57-58.)

After speaking with Ryan, Holmes left a message on Gatto's answering machine which Gatto played for the court.  Gatto claimed that Holmes stated in the message that he "received a counteroffer."(Id. at 70-71.)  Holmes claimed that he said, "I received our counteroffer."  (Id.) After Gatto played the tape, the following exchange took place with respect to the tape:

> (Whereupon, the tape was played.)
>
> MISS GATTO:   Now, as you just heard, that's October 20th, 2008 at 4:07 p.m. He left a message on my machine, stating he received a counteroffer from the defendant.
>
> THE COURT:   I didn't hear that.
>
> MISS GATTO:  Sure. Can I play it again?
>
> THE COURT:    My recollection was, some important information.
>
> (Whereupon, the tape was played.)
>
> MISS GATTO:  I'll try to record it this time.
>
> (Whereupon, the tape was played.)
>
> THE COURT:   Could you play that one more time? I don't know whether the word "our counteroffer" was there.
>
> MISS GATTO:  He said, I received a counteroffer.
>
> THE COURT:    No. Just play it again.
>
> (Whereupon, the tape was played.)
>
> MISS GATTO:  He says, I have a counteroffer.  Does anybody need to hear that again?

THE COURT:   Well –

THE WITNESS:[Holmes] I'll answer questions. I believe I said, I said,
I received our counteroffer.

BY MISS GATTO: Q. It says, I have a counteroffer.

A. [Holmes]  Okay. I think it's -- it speaks for itself, but, okay.

(Id. at 71-72.)

In a follow-up phone conversation with Gatto, Holmes claimed that Verizon accepted a

$50,000 offer, subject to the same terms and conditions initially discussed by the parties during

mediation.  (Id. at 76.)  According to Holmes, Gatto expressed concern to Holmes over releasing

her separate claims against Verizon. (Id.)  Gatto claimed that Holmes said that he had received an

offer of $50,000 from Verizon, and that he tried to talk her into taking the offer during that phone

conversation.  (Tr. II at 46-47.)

Meanwhile, Ryan reduced the settlement agreement to writing and forwarded it to

Holmes on October 21, 2008.  (Tr. I at 58.)  The agreement stated in part:

> [Holmes], this will confirm our conversation yesterday during
> which Verizon accepted Miss Gatto's $50,000 demand to settle the
> above-captioned lawsuit. As discussed, this amount will be paid in
> exchange for Ms. Gatto's execution of a Confidential Settlement
> Agreement and General Release, which will include, inter alia:
> --a release of any and all claims by Ms. Gatto against Verizon, its
> agents, employees, related entities, etc., including administrative
> charges, grievances filed through the union, and the lawsuit; no
> admission of liability by Verizon; strict confidentiality and
> non-disparagement by Ms. Gatto...; an agreement by Miss Gatto never
> to re-apply for employment with Verizon.

(Def.'s Ex. 1; Tr. I at 22.)

After receiving Ryan's confirmation, Holmes replied that Gatto was uneasy with this

agreement, and that while there was no cause for concern, he wanted to speak with Gatto one

more time.  (Tr. I at 23.) Ryan replied that throughout the negotiations all parties understood

Verizon's terms, and since Verizon accepted Gatto's offer to settle for $50,000, the matter was resolved, and if necessary, a motion to enforce the settlement agreement would be filed. (<u>Id.</u> at 24.)

When Holmes spoke with Gatto on October 21, 2008, he told her that Verizon believed the $50,000 agreement was finalized. (Tr. II at 47.) Gatto, however, thought the $50,000 was Verizon's offer, leaving her with the right of refusal. (<u>Id.</u> at 48.) Gatto told Holmes to call Ryan the following day to inform Verizon that she never authorized the $50,000 demand. (<u>Id.</u>) Gatto never executed the settlement agreement. (Tr. I at 26.)

After the refusal by Gatto to sign the settlement agreement, the relationship between Holmes and Gatto rapidly devolved. An email from Gatto to Holmes on October 28, 2008 stated in part: "Many things that you have stated have been false and inaccurate. Specifically, I never agreed to a settlement amount of $50,000 or to include my arbitration case as part of any settlement with Verizon." (Pl.'s Ex. G.) That email was in response to a letter sent by Holmes to Gatto on October 24, 2008, in which Holmes stated in relevant part:

> As we discussed, I think it is quite clear that we had a rather large misunderstanding or miscommunication. As everything stands now, we have a settlement agreement with Verizon for $50,000 to settle not only the discrimination and retaliation case, but also your arbitration case. . . .
>
> [Y]ou have made three points clear since Verizon accepted the offer. First, you claim you never gave me authority to settle the case for $50,000. Second, even if you did give me authority to settle it for that amount, I did not have authority to settle the arbitration. Third, you were not aware that if we stated an amount for which we would settle for and Verizon accepted, that we were obligated to execute a settlement agreement. . . .
> ....
>
> I disagree with your recollection of the events leading up to Verizon accepting our offer of $50,000. I believe that I did, with your permission, have authority to settle the case for $50,000. More specifically, I recall us offering that amount after Verizon offered $30,000, because neither of us believed that Verizon would increase their amount by $20,000.... With

> respect to my having authority to settle the arbitration, I believed that from
> the beginning Verizon made two things very clear – any settlement would
> not include reinstatement and any and all claims you had against Verizon,
> which included the arbitration, would also be released....
>
> ....
>
> Finally, asking me to "not admit in writing that an offer was made" and
> make up a new story to defend against a motion to enforce the settlement
> agreement was completely inappropriate....
>
> ....
>
> [A]fter the motion to enforce the settlement is filed, and Verizon will be
> filing it, if the case moves on I will be withdrawing with your permission.

(Def.'s Ex. 3.)

In another email dated November 13, 2008, Gatto demanded that Holmes continue

drafting a response to Verizon's Motion to Enforce Settlement Agreement, and that Holmes

forward to her all emails and documentation of the negotiations with Ryan. (See Def.'s Ex. 6.)

Holmes sent Gatto the documents he saved from the negotiations with Ryan and reiterated that he

was withdrawing from the case. (Id.)  In his reply, dated November 18, 2008, Holmes stated:

> [W]e are going through this ordeal because you did not, as you
> claim, understand what an offer and acceptance is. With that said,
> we made a valid offer and they accepted. . . .
>
> ....
>
> Despite the fact that I strongly disagree with the fact that you never
> gave me authority to make an offer, I've made a good faith effort to
> make an argument on your behalf. . . . You refuse to let me do my
> job, and when I do, you claim I do so without your "authority." I've
> had your authority in everything. And your claim that you did not
> know that the settlement included release of all of your claims and
> meant no reinstatement is simply not true. Within the first 10
> minutes at the mediation . . . it was made quite clear to you that
> these things were non-negotiable.

(Def.'s Ex. 6.)  Shortly thereafter, Holmes and Gatto severed their attorney-client

relationship. (Tr. I at 54.)

At the hearing on the motion to enforce settlement, which began on February 6, 2009, Gatto elected to represent herself.  During the course of the three-day hearing, Holmes and Gatto presented conflicting testimony about whether Holmes had express authority to settle any of Gatto's claims against Verizon.

The first witness called was Ryan, counsel for Verizon. Id. Throughout her testimony on direct exam, Ryan insisted that the additional, noneconomic terms to the settlement agreement were known throughout the negotiations. (Id. at 14-16, 18, 20, 22-23.)  With regard to Holmes' representation of Gatto, the following line of questioning took place:

> Q. [Counsel for Verizon] Now, as of October 20, 2008, were there any material terms of the settlement agreement that you had not discussed with plaintiff's counsel?
>
> A. [Ryan] No.
>
> Q. At any time during or since the mediation on October 8, 2008, did you have any reason to believe that Mr. Holmes lacked authority to settle this case on behalf of Miss Gatto?
>
> A. No.
>
> Q. Do you believe a binding settlement agreement had been reached in this case?
>
> A. Yes.
>
> Q. And when?
>
> A. October 20th.

(Tr. I at 25.)

Later that day Holmes took the witness stand and claimed that from the time of mediation on through the end of negotiations with Ryan, Verizon would only settle Gatto's lawsuit if it included a general release of all claims. (Id. at 54.)

> "Q. [Counsel for Verizon] Mr. Holmes, as of October 20, 2008,

were there any material terms of the settlement agreement that you
had not discussed with Ms. Ryan?

A. [Holmes] No.


Q. Do you believe that a binding settlement had been reached?

A. Yes.

Q. And when do you believe that a binding agreement had been reached?

A. The moment Mrs. Ryan Called me to accept the offer—

Q. That was?

A. – of $50,000.

Q. That was October 20th?

A. October 20th. That Monday, yes.

(Id. at 61-62.) On cross-examination, Holmes provided the following testimony regarding his

authority to settle Gatto's claims:

Q. [Gatto] Do you recall when I first told you that I felt that you
had made the agreement without my knowledge or consent, and
that I expected you to call Miss Ryan and explain that to her?

A. [Holmes] No, but it was after the Monday. It was after the time
that they had accepted the – no, I don't remember the exact date,
but I know it was after Monday, the 20th, I guess.

(Id. at 81.)

The hearing was continued until February 11, 2009, at which point Holmes returned to

the stand and testified:

Q. [Gatto] So do you have any documents that show your authority
to settle this case for me?

A.      [Holmes] No, no.

Q. Did we have a contractual agreement regarding your representation of me?

A. Yes.

Q. Did I have the sole authority to authorize settlement?

A. Yes.

(Tr. II at 9.) On redirect examination, Holmes testified in part:

Q. [Counsel for Verizon] Am I correct, Mr. Holmes, and if I'm understanding your testimony both here today and last week, you are unequivocally testifying that you had express authority from your client to settle all of her claims against Verizon for $50,000?

A. [Holmes] Yes.

Q. And that, indeed, appears to be the crux of the issue. . . .  [I]f you could explain to the Court on what basis, the basis for your belief that you, indeed, had express authority from Ms. Gatto to settle globally all of her claims against Verizon, in exchange for Verizon giving her the gross amount of $50,000.

***

A. Prior to negotiations, I did inform Ms. Gatto that, as in every employment case, a part of the agreement always requires you to never apply again, which prohibits you to be reinstated, as well as release any claims. That's the typical language.
     I spoke with Mrs. Ryan prior to the mediation, and we did discuss that at the mediation... with all of the parties sitting there... that it was Verizon's position that any statement, or any settlement offer from this point on in negotiations definitely includes no reinstatement, and her release of any pending claims.
     At that time I was under the impression that my client understood it. I spoke with her on numerous occasions about it. . . . So, my understanding, and I thought that I was pretty sure I made it very clear to my client, as well as opposing counsel and the mediator, that was definitely a term of the agreement, and would also be a term of the agreement. So, any, any time that I did offer and speak with Miss Gatto about the settlement, it was understood that that was definitely going to be a part of the agreement, the settlement offer.

(Id. at 32-35.)  In reference to the brief that Holmes prepared in opposition to Verizon's motion

to enforce settlement, Holmes' testified:

Q. [Counsel for Verizon] And in fact, Mr. Holmes, in the conclusion that you wrote on the last page of the document, you, in fact, say, according to plaintiff, you didn't have authority; correct?

A. [Holmes] Correct.

Q. And am I correct that that was your way of saying this was her belief, not yours?

A. Yes. And I sent that document to her in an e-mail that prefaced the whole brief.

\*\*\*

Q. And in fact… that's one of the reasons you withdrew your representation, is because you did not agree with her, with her contention that you lacked express authority to settle?

A. Correct.

Q. In fact, am I correct that it is your unequivocal view that you, indeed, had express authority from Cathalene Gatto to enter into a settlement with Verizon, pursuant to which Verizon would pay her $50,000. In exchange for that, Verizon would obtain, among other things, total global resolution of all of Miss Gatto's claims against Verizon, up to the date that she would – up to the date that the settlement was reached?

A. Yes.

(Id. at 36-37.)

Gatto took the witness stand and refuted the testimony of Holmes. She testified:

Q. [Gatto] Nowhere in the point – no point in that conversation on October 13th [after the rejection of $25,000] did we discuss any further negotiations. [Holmes] never asked me to do any more negotiations. I never gave him any authority to do any negotiations. Everything was over, as far as I was concerned, on October 13th. We were done.

\*\*\*

And he mentioned the offer of the $30,000, and I said, while I was clear, I said, there's no offer that I will accept that still includes my arbitration case. And I told Mr. Holmes that from the very first day I hired him; that my

11

arbitration case was never a bargaining chip in any
negotiations, ever.

(Id. at 44-45.)  During cross-examination, Gatto repeated her view that Holmes lacked express

authority to settle her claims. She testified:

> Q. [Counsel for Verizon] Now, am I correct that you're now stating
> that you never authorized Mr. Holmes to offer $70,000 to settle the
> case?
>
> A. [Gatto] That's correct.
>
> Q. You never authorized him to offer 50?
>
> A. Okay. I think we need to be clear her [sic]. Are we going back
> to the mediation?
>
> Q. Ever, ever.
>
> A. Are we still on the mediation? The only time I ever made an
> offer to Mr. Holmes was at the mediation. Other than that, never,
> ever.
>
> Q. I just want to make it understood that your position under oath
> is that because you heard Mr. Holmes say under oath that he, that
> you authorized him to settle for 70, you're saying that was a lie?
>
> A. That is a lie.
>
> Q. Mr. Holmes is lying?
>
> A. Absolutely.
>
> Q. And you heard him testify that unequivocally he had your
> authority to offer to settle for 50. So, you're saying that was a lie?
>
> A. That's absolutely incorrect; yes.
>
> Q. That Mr. Holmes was sitting here, that he lied, and so, he was
> committing perjury?
>
> A. He did not tell the truth; that's correct.
>
> Q. But you are?

A. That's correct.

(Id. at 56-57.)

On March 5, 2009, the third day of the hearing on the motion to enforce settlement,

Holmes was recalled to the witness stand. Holmes was asked about the previously privileged

letter he sent to Gatto on November 18, 2008. He testified:

> Q. [Counsel for Verizon] In this e-mail, Mr. Holmes, you
> make some reference to having [Gatto's] authority.
> You say, I've had your authority in everything. You're referring
> there to the authority to settle all of Miss Gatto's claims,
> including her grievances, for $50,000?
>
> A. [Holmes] Yes.

(Tr. III at 21-22.)

The Mediator was called to testify, but he did not remember any salient points about the

mediation. (See Transcript of Motion to Enforce Settlement Hearing, Day Four, May 26, 2009 at

9-36.)

**Conclusions of Law**

The court must consider state law, in this case Pennsylvania state law, to determine the

viability of a settlement agreement when the claims consist of both federal and state claims

(ADA and PHRA).  Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991).  Under Pennsylvania law,

"an attorney must have express authority in order to bind a client to a settlement agreement."

Reutzel v. Douglas, 870 A.2d 787, 790 (Pa. 2005) (citing Rizzo v. Haines, 555 A.2d 58, 66

(1989); Archbishop v. Karlak, 299 A.2d 294 (1973); Starling v. West Erie Ave. Bldg. & Loan

Ass'n, 3 A.2d 387 (1939); McLaughlin v. Monaghan, 138 A. 79 (1927)).  "The rationale for this

rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and

such rights should only be forfeited knowingly."  Id. (citing Starling, 3 A.2d at 388 ("apparent or

implied authority does not extend to unauthorized acts which will result in the surrender of any substantial right of the client, or the imposition of new liabilities or burdens upon him")).

Oral settlement agreements are recognized in Pennsylvania.  McDonnell v. Ford Motor Co., 643 A.2d 1102, 1105-06 (Pa. Super. Ct. 1994).  A voluntary settlement agreement is binding on the parties "whether or not made in the presence of the court, and even in the absence of a writing." Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970) (citing Good v. Pennsylvania R.R. Co., 384 F.2d 989 (3d Cir.1967); Kelly v. Greer, 365 F.2d 669 (3d Cir.1966); Main Line Theatres, Inc. v. Paramount, 298 F.2d 801 (3d Cir.1962)).  "Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts." D.R. by M.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir.1997).  Settlement agreements are interpreted and enforced pursuant to general rules of contract interpretation and contract law.  Friia v. Friia, 780 A.2d 664, 668 (Pa. Super. Ct. 2001).  "If parties agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'"  Johnston v. Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985) (quoting Courier Times, Inc. v. United Feature Syndicate, Inc., 445 A.2d 1288, 1295 (Pa. Super. Ct. 1982)).  Under Pennsylvania law, "the party alleging a compromise or settlement agreement has the burden of pleading and proving both the existence of the agreement and the *actual* authority of the attorney to enter into it."  In re Condemnation of Lands, 699 A.2d 1331, 1335 (Pa. Commw. Ct. 1997)  (emphasis in original).

Verizon presented a substantial amount of evidence about the essential terms of the settlement agreement and attempted to show that Gatto was aware of those terms.  It is clear to the court that the terms and conditions of the mediation offer were understood by both parties at

the time of the mediation.  With respect to the mediation offer, it was understood that any

settlement agreement would include a full release of all claims Gatto had against Verizon, an

agreement not to reapply with Verizon, a nondisparagement agreement, and a confidentiality

agreement.  It is also clear to the court that Holmes entered into an agreement on his client's

behalf for $50,000, including those terms.  The issue before this court, however, is whether

Holmes had Gatto's express authority to enter into a settlement agreement on those terms.

Both parties presented conflicting evidence from Gatto and Holmes with respect to the

issue of express authority and this court is charged with determining which witness is credible.

In order to make credibility determinations, the court was able to observe the witnesses'

demeanor and reactions when they were being questioned, to compare the testimony with the

exhibits, to listen to the telephone recordings, and to review the transcripts for inconsistencies.

There were substantial inconsistencies in both witnesses' testimony and neither witness was

viewed as being especially credible with respect to the issue of express authority.  At the very

least there was a breakdown in the clarity of the communications between attorney and client.

For example, Ryan testified that on October 13, 2009, Holmes told her that he was

authorized to settle the case for as little as $50,000.  Later during Holmes' testimony, however,

Holmes claimed that Gatto did not give him authority with respect to the $50,000 offer until after

October 17, 2009, but before October 20, 2009.  After Holmes learned from Ryan that Verizon

accepted the $50,000 figure, he called and left a message on Gatto's answering machine.  Gatto

played the tape of the message in court.  The recording was rough and it was difficult to

understand the first part of the message.  Gatto claimed that Holmes stated, "I have a

counteroffer." (Tr. I at 70-71.) When Holmes was asked to explain that statement during his

testimony, he claimed that he said, "I received our counteroffer."  (Id.)  The recording was

difficult to hear, and the court was unable to discern exactly what Holmes said.  The court, however, notes it is awkward to tell someone that the other side has accepted your offer by saying, "I received our counteroffer."  That kind of statement is not consistent with someone who had his client's express authority to settle a case and was telling his client the good news.

The court concludes that it was more likely than not that Gatto's interpretation was correct and Holmes said, "I have a counteroffer."  This is consistent with Gatto's theory that Holmes received a counteroffer from Verizon.

When Holmes later talked to Gatto and learned that she would not accept the $50,000 offer, he realized he already told Verizon's counsel that there was a settlement and tried to talk Gatto into accepting the offer.  The court, however, is convinced that Gatto did know Holmes was trying, with her permission, to obtain a higher offer from Verizon.  The burden of proof with respect to this issue, however, is placed squarely on Verizon.  "Under Pennsylvania law, enforceability of a settlement agreement is governed by principles of contract law.  The burden of proof is on the party attempting to enforce the settlement agreement." Adapt of Phila. v. Phila. Hous. Auth., No. Civ.A. 98-4609, 2005 WL 3274331, at *3 (E.D. Pa. Aug. 25, 2005) (internal citations omitted).  Under Pennsylvania contract law, the party seeking to demonstrate a breach of contract must prove the existence of the contract by a preponderance of the evidence.  Adani Exports Ltd. v. AMCI Export Corp., No. 05-304, 2007 WL 4298525, at *13 (W.D. Pa. Dec. 4, 2007) (citing Viso v. Werner, 369 A.2d 1185, 1187 (Pa. 1977)).  The party with the burden must prove, in light of all the evidence, that what he or she claims is more likely so than not so.  In other words, if the evidence favorable to one party and the evidence favorable to the other party were placed on opposite sides of the scales of justice, the party with the burden would have to

make the scales tip somewhat on his or her side.  See Kao Corp. v. Unilever U.S., Inc., 334 F. Supp. 2d 527, 549 (D. Del. 2004).

Based upon the evidence presented, the court does not find Holmes or Gatto to have accurately remembered the events.  It is debatable that Gatto wanted a higher offer, but did not want to give up her other claims to obtain that higher amount.  Under these circumstances, the court finds the scales of justice remain evenly balanced on the issue whether Gatto expressly authorized the settlement and Verizon failed to meet its burden of proving that Holmes had the express authority of his client when he settled this case with Verizon for $50,000.  Verizon's motion to enforce the settlement agreement is denied and Gatto's motion to deny enforcement of the settlement agreement is granted.[1]

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: September 22, 2009

---

[1] This case is a good example of why the final proposed terms of a mediation offer should be memorialized in writing and for subsequent offers to be communicated in writing between counsel and between counsel and his or her client.  The difficulties encountered in this case would likely not have existed had the terms been clearly communicated in writing.